

**ORDERED in the Southern District of Florida on July 30, 2010.**

_____

**A. Jay Cristol, Judge
United States Bankruptcy Court**

_____

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **TRANSCAPITAL FINANCIAL CORPORATION,** | **Case No. 06-12644-AJC** |
| **Debtor.** | |
| _____/ | |

## <u>MEMORANDUM OPINION OVERRULING OBJECTION TO CLAIM OF OYBS</u>

**THIS CAUSE** came before the Court on May 13, 2010, at the hearing on the Objection to OYBS, LLC's ("OYBS") Claim Nos. 65 and 66 (the "Objection") [D.E. 558] filed by Jeffrey Beck, as Liquidating Agent (the "Liquidating Agent") for the debtor, Transcapital Financial Corporation ("TFC" or the "Debtor").

The Court has carefully considered the Objection, the Response filed by OYBS [D.E. 572], and the Supplemental Response filed by OYBS [D.E. 896], has heard the testimony of

- 1 -

witnesses and argument from respective counsel, and reviewed evidence admitted into the record.  For the reasons stated on the record at the hearing on the Motion, which are incorporated by reference herein, the Court finds and concludes as follows:

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

## FINDINGS OF FACT

1.      This Court has jurisdiction over this proceeding pursuant to sections 157(b) and 1334 of Title 28 of the United States Code.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

3.      Venue is proper in this district pursuant to 28 U.S.C.  §§ 1408 and 1409.

4.      OYBS timely filed a proof of claim (Claim No. 65) in this bankruptcy case.[1] OYBS' claim is predicated upon an agreement entered into by and between OYBS, the Debtor, Transcapital Financial Corporation ("TFC"), and America Capital Corporation ("ACC"), which is entitled "Goodwill Claim Financing and Investment Agreement" (the "OYBS Agreement"). The OYBS Agreement was entered into in April 2004.

5.      As set forth on the face of the OYBS Agreement, the purpose of the OYBS Agreement was to provide financing to TFC and ACC (collectively, the "Companies") to enable them to continue to prosecute litigation against the Untied States in the U.S. Court of Federal

---

[1] OYBS filed an identical claim (Claim No. 66) in this case.  The parties stipulated that this claim was duplicative and was intended to have been filed in the companion case of America Capital Corporation.  Thus, Claim No. 66 will be disallowed by separate order and these findings and conclusions will focus solely on Claim No. 65.

Claims in the matter styled: *American Capital Corp., et al. v. The United States*, Case No. 95-523C (the "Goodwill Litigation").

6.      It has been stipulated that, at the time of the OYBS Agreement, the Companies had no assets other than their claims in the Goodwill Litigation and any possible recovery they might ultimately realize in that litigation.

7.      In the Goodwill Litigation, the Companies asserted claims against the United States for breach of contract.  The gist of the Companies' claims was that the United States had breached a prior agreement with the Companies to allow one of their subsidiaries, TransOhio Savings Bank ("TransOhio"), to count "supervisory goodwill" on its balance sheets toward meeting its regulatory capital requirements.  The Companies maintained that the United States breached that agreement when the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") was enacted and effectively disallowed the use of supervisory goodwill towards meeting regulatory capital requirements.  The Companies alleged that, as a result, TransOhio fell out of regulatory capital compliance, ultimately leading to its failure and takeover by the federal Office of Thrift Supervision.

8.      In October 2003, the Court in the Goodwill Litigation granted a partial summary judgment in favor of TFC on liability on TFC's breach of contract claim.  *Am. Capital Corp. v. United States*, 58 Fed. Cl. 398 (2003).  The Court then found that TFC was entitled to recover "reliance" based damages for that claim, which the Court conditionally determined were in the amount of $168 million.  *Am. Capital Corp. v. United States*, 59 Fed. Cl. 563 (2004).  However, the Court scheduled a trial on the issue of the damages to allow the government to attempt to prove that the government's breach did not proximately cause TFC's damages – i.e., that TFC

would still have suffered some or all of those damages in any event regardless of the government's breach.

9.      The Companies needed to retain expert witnesses in connection with the trial on damages.  As testified to by the Companies' former Executive Vice President, Steven Cook, the Companies began reaching out to numerous prospective financing sources to see if they would be interested in providing financing to enable the Companies to retain experts.  In connection with those efforts to secure financing, the Companies offered to pay investment returns that were as much as four times the amount invested and that were to only be paid, if at all, from any proceeds realized in the Goodwill Litigation.  Mr. Cook testified that he believed such proposals to be fair and reasonable under the circumstances based on the Companies' financial condition and the risks associated with the financing.  He further testified that, based on the Companies' financial condition, it was not a candidate for any type of conventional bank loan.  It bears noting that Mr. Cook is a certified public accountant who appears to have had extensive experience in both commercial lending and equity investments, having been involved in the management of a savings and loan (TransOhio) and also having been involved in the management of a private equity investment firm.

10.      Among the parties who the Companies reached out for financing were Kenneth Marlin ("K. Marlin") and Roger Miller ("R. Miller").  K. Marlin and R. Miller, either directly or through entities they controlled, were substantial creditors of the Companies – holding subordinated notes issued by TFC's parent, ACC (the "ACC Notes").   The Companies' management believed that K. Marlin and R. Miller might be interested in providing financing to support the Goodwill Litigation because their only hope of receiving any payment on the ACC Notes they held was for the Companies to succeed in the Goodwill Litigation.

11.     K. Marlin ultimately agreed to provide some of the financing sought by the Companies.  He formed OYBS to provide that financing and entered into negotiations with the Companies that ultimately led to the execution of the OYBS Agreement.

12.     All of the parties to the OYBS Agreement were represented by counsel in connection with the negotiation of the agreement.  It was clear from the testimony presented at the hearing that it was the Companies who reached out to K. Marlin and OYBS to seek financing, and that it was the Companies who originally proposed, without prodding or solicitation by OYBS or K. Marlin, to pay a return of four times any amount invested, conditioned upon the Companies ultimately prevailing in the Goodwill Litigation and securing proceeds with which to pay such a return.

13.     Under the express terms of the OYBS Agreement, OYBS agreed to provide the Companies with $125,000.00 in financing, which was characterized as an "investment".  In exchange, the Companies agreed that OYBS would be entitled to receive four times the amount of its investment ($500,000.00) to be paid only from any proceeds realized from the Goodwill Litigation, plus an additional one percent of the Goodwill Litigation proceeds.  These amounts were characterized in the Agreement as the "Investor Return".

14.     Based on the testimony presented at the hearing, and based on the plain language of the Agreement itself, the Court is persuaded the parties intended and understood that the payment of the Investor Return was to only come from the Goodwill Litigation "proceeds" and was therefore contingent upon the Companies ultimately prevailing in the Goodwill Litigation and realizing proceeds from which OYBS could be paid.

15.     If the Companies were ultimately unsuccessful in the Goodwill Litigation, the Companies would have neither the ability nor the obligation to pay OYBS anything, and OYBS would lose its entire $125,000.00 investment.

16.     It was undisputed that OYBS in fact advanced $125,000.00 to the Companies pursuant to the Agreement and that those funds were used to pay for Goodwill Litigation expenses, including specifically the retention of experts.

17.     Shortly following the execution of the Agreement, the Companies entered into an identical Goodwill Claim Financing and Investment Agreement with R. Miller, which provided for the identical "Investor Return" as the OYBS Agreement and which was similarly subject to and conditioned upon the Companies' success and receipt of proceeds in the Goodwill Litigation. Mr. Cook testified that the Investor Return was proposed to R. Miller by the Companies – it was not demanded or negotiated by R. Miller.

18.     Mr. Cook testified that the Companies had reached out to numerous potential financing sources both before and after TFC had secured the Partial Summary Judgment and that, with the exception of K. Marlin and R. Miller, all had declined to provide financing due to the risk involved.

19.     Although the OYBS Agreement makes no reference to the term "loan" and does not have the hallmarks of a loan (e.g., no maturity date, no promissory note, no stated interest rate), Mr. Cook and K. Marlin testified that they viewed the OYBS Agreement as a "loan" – albeit one where repayment was contingent upon success in the Goodwill Litigation.  Mr. Cook, who indicated that he was well aware of the usury laws based on his background in commercial lending and private equity, testified that he did not consider the OYBS Agreement or the identical financing agreement with R. Miller to be usurious transactions  He testified that he

believed both agreements to be valid and enforceable obligations of the Companies that were reasonable under the circumstances and that he would still support them today.   K. Marlin testified that usury was a concern raised by his counsel in the negotiation of the OYBS Agreement, but that he believed the OYBS Agreement to be a valid and enforceable contract that he only entered into after obtaining advice from counsel.

20.     It is also clear from the testimony presented and from the Claims Register in this case, that the Companies made numerous other financial arrangements which were similarly contingent upon the Companies' ultimate success and receipt of proceeds from the Goodwill Litigation.  The Companies entered into agreements with attorneys, management and directors, which were contingent upon the Companies' success in the Goodwill Litigation. These contingent fee arrangements typically included "kickers" – such as agreements to pay attorneys 2.5 times their ordinary hourly fee if the Goodwill Litigation proved successful.  Mr. Cook testified that he believed these arrangements to be reasonable under the circumstances based on the financial condition of the Companies and the risk associated with dealing with the Companies.

21.     In or about October 2004, Robert Marlin and Robyn Marlin entered into an agreement with K. Marlin pursuant to which K. Marlin agreed to transfer to Robyn Marlin all of OYBS' right, title and interest in the OYBS Agreement and any claims to be asserted against the Companies for the purchase price of $125,000.00 – the amount that OYBS had originally advanced to the Companies.

22.     In accordance with their agreement, Robyn Marlin paid K. Marlin the $125,000.00 and ultimately acquired all of OYBS' rights and interests under the OYBS Agreement.  It was undisputed that, when Robert Marlin entered into the agreement with K.

Marlin to acquire OYBS' rights, Robert Marlin believed the OYBS Agreement to be a valid and enforceable obligation of the Companies (albeit subject to a contingency), and that neither K. Marlin nor his counsel ever suggested or claimed that the Agreement might be considered a usurious loan transaction.

23.     The Goodwill Litigation did not ultimately conclude until 2007.

24.     In the summer of 2004, the Court of Federal Claims conducted a lengthy trial on the issue of damages. *See Am. Capital Corp. v. United States*, 66 Fed. Cl. 315, 330 (2005).  At that trial, the United States presented evidence and advanced arguments that TFC would have incurred the losses it claimed as damages regardless of the government's purported breach (because of mismanagement, bad loans, etc.).  The United States maintained that TFC should recover no damages. *See generally id.*

25.     On or about April 2005, the Court of Federal Claims entered an Omnibus Order denying and granting in part various motions for reconsideration that had been previously filed by the United States Government, including a motion for rehearing of the Court's February 27, 2004, Partial Summary Judgment that was still pending at the time of the OYBS Agreement. *Am. Capital Corp. v. United States*, 65 Fed. Cl. 241 (2005).

26.     Shortly after that, on or about May 2005, the Court of Federal Claims issued a final judgment in favor of TFC only (ACC recovered nothing) in the amount of $109 million ("Final Judgment"). *Am. Capital Corp.*, 66 Fed. Cl. at 399 (2005).

27.     The United States took an appeal of the Final Judgment.  In that appeal, the United States sought the reversal of the Final Judgment in its entirety. *Am. Capital Corp. v. F.D.I.C.*, 472 F.3d 859 (Fed. Cir. 2006).

28.     Shortly after the appeal was filed, the Companies issued a Status Report dated September 2005 regarding distribution to creditors in which the Companies represented that the Goodwill Litigation was on pending appeal and that the final outcome of the litigation could not be predicted.  The Companies noted that many other financial institutions had brought similar claims against the United States and had ultimately failed.  Mr. Cook conceded that, although TFC felt good about its ultimate chance of prevailing, the final outcome remained uncertain and unpredictable until the conclusion of the appeal.

29.     In addition, the Companies' September 2005 Status Report lists the various obligations of the Companies that were to be paid out of any Goodwill Litigation proceeds.  The listed obligations expressly include the obligations to OYBS under the OYBS Agreement.  Mr. Cook testified that he believed the representations in the Status Report to be true and accurate and that he believed the OYBS Agreement to be a valid and enforceable obligation of the Companies at the time that the Status Report was issued in September 2005.  Mr. Cook reiterated that he was familiar with the usury laws and did not believe the OYBS Agreement to be a usurious transaction.

30.     The Court of Appeals for the Federal Circuit ultimately reversed in part and affirmed in part the lower court's Final Judgment, reducing the Final Judgment from $109,000,000.00 to $33,166,000.00.  *See Am. Capital Corp.*, 472 F.3d at 869.  The opinion is dated October 30, 2006, with rehearing and rehearing en banc denied on March 8, 2007.  The Appellate Court's Mandate was not issued until March 15, 2007.  The United States paid the $33,166,000.00 judgment to TFC on or about July 9, 2007.

31.     Based on the Companies' receipt of proceeds from the Goodwill Litigation in the amount of $33,166,000.00, OYBS is seeking the sum of $831,660.00 pursuant to the OYBS

Agreement (four times the original amount invested plus one percent), together with interest on the claim from the date it accrued and attorney's fees.

## CONCLUSIONS OF LAW

1.       The Liquidating Agent has objected to OYBS' Claim under the OYBS Agreement on the grounds that the OYBS Agreement constitutes a criminally usurious loan under Fla. Stat. § 687.071.  The Liquidating Agent contends that this renders the entire OYBS Agreement, including any agreement to even return the original invested amount of $125,000.00, completely unenforceable.  Fla. Stat. § 687.071 provides that it is criminal usury for any person making an extension of credit to any other person to knowingly and willfully charge interest at a rate over 25% per annum, and that no extension of credit made in violation of the Section is an enforceable debt.

2.       Under Florida law, the four elements of usury are:

   (1)    An express or implied loan;

   (2)    An understanding between the parties that the money lent is to be returned;

   (3)    An agreement to pay a greater rate of interest than the law allows; and

   (4)    A corrupt intent to take more than the allowable legal rate of interest for the use of the money loaned.

*In Re Vision Dev. Gr. of Broward County, LLC*, 411 B.R. 768, 772 (Bankr. S.D. Fla. 2009) (citing *Dixon v. Sharp*, 276 So. 2d 817, 819-20 (Fla. 1973)).  These elements are stated in the conjunctive and must all be present in order to establish the existence of a usurious transaction.

3.       Usury is an affirmative defense.  As the party asserting that defense, the Liquidating Agent bears the burden of proof.  *See Valliappan v. Cruz*, 917 So.2d 257, 259-60 (Fla. 4th DCA 2005) (citing *Phillips v. Lindsay*, 136 So. 666, 668 (Fla. 1931)).  Moreover, usury must be proven by clear and convincing evidence, rather than the lower "preponderance of the

evidence" standard.  *See id.* (citing *Dixon*, 276 So.2d at 820) ("He who alleges usury to avoid or to defeat an obligation to pay money must establish his charge by clear and satisfactory evidence."); *Naples Cay Dev. Corp. v. Ferris*, 555 So.2d 1272, 1273 (Fla. 2d DCA 1989); *Diversified Enterp., Inc. v. West*, 141 So.2d 27, 29 (Fla. 2d DCA 1962).  This Court must also be guided by the established principle of Florida law that when a financing arrangement claimed to be usurious is capable of more than one construction, courts are to presume a lawful, rather than an unlawful, purpose.  *L'Arbalete, Inc. v. ZACZAC*, 474 F. Supp.2d 1314, 1324 (S.D. Fla. 2007) (citing *Diversified Enterp., Inc.*, 141 So.2d at 30).

4.      In determining whether a transaction is usurious, Florida courts look at the substance of the transaction, not the form or designation given to it by the parties.  *Id.* at 1323.  OYBS maintains that when the repayment of an amount financed under an agreement is subject to a contingency and does not constitute an absolute and unconditional obligation of the debtor, the transaction falls outside the ambit of the usury laws.  OYBS argues that the existence of a contingency that renders the financing "at risk" defeats the usury claim regardless of whether the transaction is labeled as an "investment agreement" or a "loan".

5.      Florida law is in accord with the basic proposition that a loan or financing agreement will not be deemed to be usurious when repayment is made subject to the occurrence of a contingency.  *See, e.g., Kraft v. Mason*, 668 So. 2d 679, 684 (Fla. 4th DCA 1996) (citing *Bailey v. Harrington*, 462 So. 2d 861 (Fla. 3d DCA 1985)) ("A loan agreement is not usurious when payment depends upon a contingency."); *Valliappan*, 917 So. 2d at 260 (same); *Beausejour Corp. N.V. v. Offshore Dev. Co., Inc.*, 802 F.2d 1319, 1321 (11th Cir. 1986) (citing *Britz v. Kinsvater*, 351 P.2d 986 (Ariz. 1960)) (same); *L'Arbalete*, 474 F. Supp. 2d at 1324 (same).

6.      As stated by the Eleventh Circuit Court of Appeals, "when a lender risks the

principal with the chance of either getting a greater return than the lawful interest rate or possibly

getting nothing (if the contingent event fails to occur), there is no usury." *Beausejour Corp.*, 802

F.2d at 1321.  In *Beausejour*, the Eleventh Circuit, quoting an Arizona Supreme Court case, gave

the following instructive example of a contingent, non-usurious loan transaction:

> An example of a debt contingently repayable is posed by this
> situation:  Borrower says to Lender:  lend me $10 to bet on a horse
> race, and if the horse wins, I promise to pay you $15 tomorrow; if
> the horse loses, you get nothing.

*Id.* (citing *Britz*, 351 P.2d at 392).  The fact that repayment of the loan is contingent upon the

result of the horse race renders the transaction non-usurious even though the lender stands to

potentially earn a 50% return in a single day.

7.      An even more factually analogous example of this principle is provided in the

case of *Kraft v. Mason*.  In that case, just as in this case, the alleged borrower had approached the

alleged lender seeking financing for an anti-trust suit in which the borrowers were plaintiffs.  The

lender in that case entered into a loan agreement with the borrower pursuant to which the lender

agreed to loan the borrower $100,000.00 with any interest or return to the lender to be paid from

any proceeds realized in the anti-trust suit.  More specifically, the borrower agreed to pay the

lender 20% of the first $1,000,000.00 recovered in the anti-trust suit, 6% of the next

$4,000,000.00 recovered, and 3% of any recovery in excess of five $5,000,000.00, in exchange

for the loan of $100,000.00.  The anti-trust suit settled for an amount in excess of $5,000,000.00,

which would have required the borrowers to pay the lender more than $350,000.00 under the

terms of the parties' loan agreement, a rate of return that was clearly in excess of the amounts

permitted under the usury laws.  The lender sued to collect the amounts due under the terms of

the loan agreement, and the borrowers defended on the grounds of usury.  The Court in *Kraft*

held that, despite being characterized as a "loan agreement", the transaction at issue was not

usurious because payment to the lender was contingent upon the successful outcome of the anti-

trust litigation.  *Kraft*, 668 So. 2d at 684.  The Court in *Kraft* stated as follows:

> Yet another reason the loan was not usurious is that the money to
> be paid Mason could be characterized as a bonus to be received for
> participating in an uncertain transaction.  A loan agreement is not
> usurious when payment depends upon a contingency.  *See, e.g.,*
> *Bailey v. Harrington*, 462 So.2d 861 (Fla. 3d DCA), *rev. den.*, 472
> So.2d 1180 (Fla. 1985), *rev. den. sub nom*, *N-Site Associates v.*
> *Harrington,* 472 So.2d 1181 (Fla. 1985); *Schwab v. Quitoni*, 362
> So.2d 297 (Fla. 3d DCA 1978).  Here, when the loan was given,
> any talk of recovery was pure speculation.  Quite possibly, there
> would be *no* successful recovery from the anti-trust litigation, and
> Mason might have collected nothing beyond the payback of the
> loan.  This contingent nature of any "interest" to Mason makes the
> agreement non-usurious.

*Id.* (emphasis in original).

8.    The Court finds that the OYBS Agreement, whether ultimately called a "loan" or

an "investment",  is exactly the type of contingent financing agreement confronted by the Court

in *Kraft*.  Based on the plain terms of the OYBS Agreement and the uncontroverted evidence

presented at the hearing, the OYBS Agreement falls squarely within the types of financing

arrangements that Florida courts have deemed to be "contingent" and, therefore, outside the

ambit of the usury laws.  The parties do not dispute that any payment to OYBS of either

principal or "return" was only to be paid if the Companies were ultimately successful in the

Goodwill Litigation and recovered proceeds.  At the time the OYBS Agreement was entered

into, the final outcome of the Goodwill Litigation remained an uncertain contingency.  If the

Companies failed to ultimately prevail in the Goodwill Litigation, then OYBS would receive

nothing and lose the entire $125,000.00 it financed.

9.    At the hearing, the Liquidating Agent advanced three basic arguments in opposition to OYBS' contention that the contingent nature of the OYBS Agreement removes it from the operation of the usury laws.  First, the Liquidating Agent relied on Fla. Stat. § 687.03 (4), which provides as follows:

> If, as provided in subsection (3), a loan, advance of money, line of credit, forbearance, or other obligation exceeds $500,000, then, for the purposes of this chapter, interest on that loan, advance of money, line of credit, forbearance, or other obligation shall not include the value of property charged, reserved, or taken as an advance or forbearance, the value of which substantially depends on the success of the venture in which are used the proceeds of that loan, advance of money, line of credit, forbearance, or other obligation. Stock options and interests in profits, receipts, or residual values are examples of the type of property the value of which would be excluded from calculation of interest under the preceding sentence.

*Id.*

10.    The gist of the Liquidating Agent's argument is that the foregoing provision codifies the case law that contingent financing agreements are not considered to be usurious, but does so only for loans in excess of $500,000.00.  The Liquidating Agent argues that, because there is no similar statutory provision for loans under $500,000.00, such transactions should be deemed usurious by implication regardless of whether repayment of the amount financed is contingent.

11.    The Liquidating Agent's argument is not supported by the language of the statute or the case law construing the usury statutes.

12.    Florida Statute §687.03(4) merely provides that when a loan or financing arrangement includes as part of the consideration to the lender a transfer of property, the value of which "substantially" depends on the success of the venture being financed (e.g., stock or stock options), such property is not counted in calculating the interest on the loan.  By way of example,

if a lender loans a start-up company $501,000.00 with a stated interest rate of 12%, but also receives stock or stock options in the start-up venture as a part of the consideration for the financing transaction, then the stock options will not be valued in determining whether the *de facto* interest rate is actually greater than the stated 12% amount. *See Bailey v. Harrington*, 462 So. 2d 861 (loan in excess of $500,000 with stated interest rate of 24.99% was not usurious – "profit participation" given by lender as additional consideration was not counted in calculating interest under § 687.03(4)). This is a different situation than a purely contingent financing arrangement of the type addressed in *Kraft*, *Valliappan*, *L'Arbalete*, etc.

13.    Florida Statute §687.03(4) has been on the books in substantially its current form for nearly forty years, and the cases decided during this period of time have held that loans under $500,000.00 were not subject to the usury laws where repayment of interest or "return" was subject to a contingency. *See, e.g., Kraft*, 668 So. 2d at 681 ($100,000 loan); *Valliappan*, 917 So. 2d at 260 ($150,000 loan); *Schwab*, 362 So. 2d at 298 ($37,000 loan).

14.    In short, Fla. Stat. § 687.03(4) does not expressly or by implication overrule the substantial body of law that contingent, at-risk financing arrangements, including those less than $500,000.00, fall outside of the usury laws.

15.    The Liquidating Agent alternatively argues that the agreement should be deemed usurious despite the fact that repayment was contingent upon success in the Goodwill Litigation because the risk of non-payment was not sufficiently "substantial". The crux of the Liquidating Agent's argument is that, even though any payment to OYBS under the Agreement was contingent upon ultimate success in the Goodwill Litigation, the risk of that contingency not occurring was relatively low because TFC had already secured a Partial Summary Judgment from the Court of Federal Claims. The Liquidating Agent argues that, for a financing transaction

to be removed from the operation of the usury laws on the grounds that a lender's funds had been placed "at risk", that risk must be "substantial".  *See Beausejour*, 802 F.2d at 1321-22.  However, courts construing the term "substantial risk" in the context of the usury laws have merely stated that, for the risk to be "substantial", the risk must be greater than the mere hazard that a borrower will fail to repay (due to lack of financial ability) or that a lender will not recover in full because of a decline in the value of security.  *See id.*; *Diversified Enterp., Inc.*, 141 So. 2d at 30.  In contrast, where repayment is subject to an express contingency, the occurrence of which is uncertain, the risk is deemed to be sufficiently "substantial" to remove the transaction from the operation of the usury laws.  *See, e.g., Kraft*, 668. So. 2d at 684; *L'Arbalete*, 474 F. Supp. 2d at 1324-25; *Valliappan*, 917 So. 2d at 260.  Indeed, in *Kraft* and *Valliappan*, the risk was arguably less than it was in this case because only the payment of the return was expressly subject to a contingency.  Under the OYBS Agreement, repayment of both principal and the return was contingent upon ultimate success in the Goodwill Litigation.

16.    In this case, it is beyond dispute that the repayment of principal and interest to OYBS was contingent upon the Companies' ultimate success and receipt of proceeds in the Goodwill Litigation.  That outcome was by no means certain at the time the OYBS Agreement was executed.  Although the Partial Summary Judgment had been entered, motions for rehearing remained pending, a trial on the issue of damages (at which the government argued that TFC's damages should be reduced to nothing) remained pending and the United States still retained all of its rights to appeal.  The final outcome of the case remained uncertain, a fact recognized by the Companies themselves in a Status Report distributed to creditors in September 2005 during the pendency of the appeal.  As further evidence of that risk, in the ultimate final adjudication of the Goodwill Litigation after appeal, ACC received nothing (despite earlier summary judgments

in its favor on the issue of liability) and TFC saw its original Partial Summary Judgment conditionally awarding damages of $168 million ultimately reduced by more than 80% to only $33 million.

17.     Unless and until a final judgment is entered and all appeals have been concluded, there is an inherent degree of risk in any litigation.  Reasonable minds may differ as to what the Companies' likelihood of success in the Goodwill Litigation was in April 2004, but they cannot differ that ultimate success still remained an uncertain contingency as of that date.  Mr. Cook conceded this fact at the hearing.  This Court cannot base a finding of criminal usury on speculation as to whether the occurrence of the contingency in this case was 78% likely or 63% likely or 47% likely to occur.  As the occurrence of the contingency was not a certainty at the time the OYBS Agreement was entered into, the funds advanced by OYBS were sufficiently "at risk" to remove the transaction from the operation of the usury laws.  *See Diversified Enterp., Inc.*, 141 So. 2d at 30; *Hurley v. Slingerland*, 461 So. 2d 282, 284 (Fla. 4th DCA 1985).

18.     Lastly, the Liquidating Agent argued that repayment under the OYBS Agreement was not truly contingent because paragraph 5 of the OYBS Agreement contained a provision that, in the event of a change of management of the Companies, the investor would be entitled to "elect to receive the investor return immediately."  This argument is ultimately unavailing.  On its face, this provision does not change the fundamentally contingent nature of the OYBS Agreement. It merely purports to provide a limited exception to that contingency (i.e., change of management).  Moreover, as all of the witnesses unequivocally testified, it was plainly anticipated that OYBS would and could only be repaid if the Companies ultimately prevailed in the Goodwill Litigation.  All parties acknowledged that the Companies would have no ability to

pay anything, change of management or not, absent success in the Goodwill Litigation, as that was the Companies' only asset.

19.     Accordingly, the Court finds that repayment of principal and "return" to OYBS was contingent upon the Companies' success and receipt of proceeds in the Goodwill Litigation rendered the financing "at-risk" and removes the OYBS Agreement from the operation of the usury laws.  Indeed, based on the testimony presented at the hearing regarding the companies financial condition, it appears that the only way the Companies could continue to operate and prosecute the Goodwill Litigation at all was to offer contingency deals with potentially large returns of the type offered to OYBS.  Conventional financing – with unconditional repayment obligations – was simply not an option. The Companies made similar contingency deals with management, counsel and other providers of financing, and Mr. Cook testified that he believed these deals to be reasonable and enforceable based on the Companies' complete lack of assets and the inherent risk of betting on a litigation outcome.  The Liquidating Agent has failed to sustain his burden of proof to demonstrate by clear and convincing evidence that the OYBS Agreement is a criminally usurious transaction under Florida's usury laws.  In reaching this conclusion, the Court is also mindful of the fact that, where an allegedly usurious agreement can possibly be construed in more than one way, courts are to presume a lawful rather than an unlawful purpose.  It is therefore

ORDERED AND ADJDUGED that the Liquidating Agent's Objection is DENIED and OYBS' claim shall be allowed in the principal amount of $831,660.00.

###

**Submitted by:**
Marc Gottlieb, Esq.
Joan Levit, Esq.
**AKERMAN SENTERFITT**
Las Olas Centre II
350 East Las Olas Blvd., Suite 1600
Fort Lauderdale, Florida 33301
954-463-2700 (ph)/ 954-463-2224 (fax)
joan.levit@akerman.com

Attorney Levit is directed to serve copies of this order on all interested parties listed and file a certificate of service.